UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ENIS CHERAMIE | CIVIL ACTION |
| VERSUS | NO:     13-0573 |
| SOCIAL SECURITY ADMINISTRATION | SECTION: "H" |

**REPORT AND RECOMMENDATION**

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("the Commissioner") pursuant to Title 42 United States Code § 405(g). The Commissioner denied Plaintiff, Enis Cheramie's ("Cheramie") eligibility for Disability Insurance Benefits ("DIB") under the Title II of the Social Security Act, 42 U.S.C. § 423.[1]

The matter was referred to the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(b), for the submission of Proposed Findings and Recommendations.

**I.    Background**

Cheramie is a fifty-five-year-old, 147 pound, 5' 5" male, with two years of a college education,[2] who has past relevant work as a crane operator.[3] He has an Associates Degree in electronics, with experience as a train operator. [4]

---

[1]*See e.g.,* Rec. Doc. No. 1, p. 1.

[2]Cheramie is presently a 55 year old male. At the time of the filing of his application for benefits he was 52 years of age. *See* Rec. Doc. No. 6-3, p. 3, Tr. 53.

[3]*Id.*

[4]R. 6-2, Tr. 35-36.

Cheramie has filed two claims for disability insurance benefits under Title II. The first claim was denied by ALJ McLeod on February 24, 2010. He protectively filed the second claim for DIB under Title II of the Social Security Act, on February 9, 2011.[5] The last date Cheramie was insured is December 31, 2013.

He alleges that he became disabled due to a back and cervical spine injury which began on February 27, 2008.[6] He initially filed a claim for disability alleging that he "broke his back" and had a "bad disk" in his neck. As a result, he complains of suffering from dizziness, nausea, migraines and arthritis pain in his arms and hands.[7] Due to his pain, he also reports that he takes 30 mg of Oxycontin and five Somas four times a day.[8]

He reported having colon cancer in 2003, as well as three bulging discs in his neck and back, a disintegrated T-12, bone spurs, stomach problems and depression.[9] He alleges that he has not been involved in any substantial gainful activity after February 25, 2010.

Cheramie's claim for DIB was denied initially on May 13, 2011.[10] On May 31, 2011, Cheramie filed a written request for a hearing by an Administrative Law Judge ("ALJ"). Philip P. McLeod, the ALJ, held a hearing on October 24, 2011.[11] During the hearing, counsel for Cheramie moved to amend the date of his alleged onset of disability to February 25, 2010. The ALJ granted

---

[5]*See* Rec. Doc. No. 6-2, p. 19, Tr. 20.

[6]*See id. See also* Rec. Doc. No. 6-3, p. 3; Tr. 53.

[7]Tr. 37-38.

[8]R. Doc. 6-2, Tr. 37.

[9]*Id.* at p. 6-7, Tr. 56-57.

[10]*See* Rec. Doc. No. 6-2, p. 19, Tr. 18.

[11]*Id.* at Tr. 28.

2

this request, providing that there was a prior decision, dated February 24, 2010, pertaining to the period of February 27, 2008 through February 24, 2010[12]. The ALJ further held that the February 24, 2010 decision was upheld upon review by the Appeals Council, and is administratively final relative to the newly defined period.[13]

The ALJ issued his written opinion on December 21, 2011, denying Cheramie's claim, finding that he was not disabled under the meaning of the Social Security Act ("SSA"), from February 25, 2010, through his date last insured, December 31, 2013.[14] The ALJ found that Cheramie had not engaged in substantial gainful activity since his alleged onset date of February 25, 2010. He also found that Cheramie suffered from several "severe impairments" including: degenerative disc disease of the cervical spine, lumbar disc bulge and status post T-12 kyphoplasty.[15] However, the ALJ found that through his last insured date, December 31, 2013, Cheramie did not have an impairment, or combination thereof, which medically equaled the impairments listed in 20 C.F.R. Part. 404, so as to constitute a presumptive disability.

As such, the ALJ found that he had the residual functional capacity ("RFC") to perform less than full range of light duty work, and that he may perform his past relevant work ("PRW") as a crane

---

[12]Cheramie began treating with Dr. Adatto in 2008 for complaints of cervical, thoracic and lumbar pain. The pain allegedly occurred after he struck his head and back on the hood of his truck following impact by another vehicle. R. Doc. 6-2, Tr. 21. In 2009 Cheramie was involved in a motorcycle accident that occurred after his heat slid over his eyes and he struck a curb and fell from his motorcycle where he sustained a comminuted fracture. *See* R. Doc. 6-2, Tr. 21.

[13]*Id.* at Tr. 18.

[14]*Id.* at Tr. 19-20.

[15]*See* Rec. Doc. No. 6-2, p. 22, Tr. 21. Kyphoplasty is a surgical procedure designed to stop the pain caused by a spinal fracture to stabilize the bone and to restore some or all the lost vertebal body height due to the compression. http://www.spine-health.com/treatment/back-surgery/description-kyphoplasty-surgery 04/08/14.

operator.[16] The ALJ also found that Cheramie had restrictions on his work capabilities, such that he could lift and / or carry no more than twenty (20) pounds at a time with frequent lifting and carrying of objects weighing up to ten (10) pounds, that he could stand and walk for four (4) to five (5) hours in an eight (8) hour day in increments of forty-five (45) minutes, and that he could stoop occasionally.[17] He also found that Cheramie had moderate limitations relative to concentration, persistence and pace for up to one-third (1/3) of the workday, but in no way would his ability to work be precluded by these additional limitations. Based on Cheramie's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in the national economy which he could have performed. Combining the foregoing with the vocational expert's testimony, the ALJ concluded that Cheramie was not disabled.[18]

Cheramie sought timely review of the ALJ's decision with the Appeals Council on February 27, 2012.[19] The Appeals Council denied Cheramie's Request for Review on January 29, 2013.[20] Thereafter, Cheramie filed the instant action in federal court, on March 28, 2013,[21] seeking review of the ALJ's decision on the grounds that the ALJ failed to apply the proper legal standard when determining Cheramie's RFC for two reasons: (1) the ALJ failed to give proper weight to the opinions of Cheramie's treating physicians and (2) substantial evidence does not support the ALJ's RFC

---

[16]*Id.* at Tr. 26.

[17]*Id.* at Tr. 23.

[18]*Id.* at Tr. 27.

[19]*See* Rec. Doc. No. 6-2, p. 15, Tr. 14.

[20]*Id.* at Tr. 1-6.

[21]*See* Rec. Doc. No. 1.

assessment of Cheramie's limitations.[22]

## II.     Standard of Review

The role of this Court on judicial review under Title 42 U.S.C. § 405(g) is limited to determining whether (1) the final decision is supported by substantial evidence and (2) whether the Commissioner applied the proper legal standards when evaluating the evidence. *See Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). The Court may not re-weigh the evidence, try issues *de novo*, or substitute its judgment for that of the Commissioner. *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir. 1981). If supported by substantial evidence, the Commissioner's findings are conclusive and must be affirmed. *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). However, an ALJ's failure to apply the correct legal test constitutes a ground for reversal. Casias v. Secretary of Health & Human Servs., 933 F.2d 799, 801 (10th Cir. 1991).

Substantial evidence is more than a scintilla and less than a preponderance, and is considered relevant such that a reasonable mind might accept it as adequate to support a conclusion. *Ripley v. Chater,* 67 F.3d, 552, 555 (5th Cir. 1995); citing *Richardson v Perales*, 402 U.S. 389, 401 (1971). It must do more than create a suspicion of the existence of the fact to be established, but no "substantial evidence" will be found where there is only a "conspicuous absence of credible choices" or "contrary medical evidence." *See Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973); *Hemphill v. Weinberger*, 483 F.2d 1137, 1138 (5th Cir. 1973). However, a single piece of evidence will not satisfy the substantiality test if the ALJ ignores, or fails to resolve, a conflict created by countervailing evidence. Evidence is not substantial if it is overwhelmed by other evidence, particularly evidence offered by treating physicians. *Franklin v. Soc. Sec. Admin.*, No. 12-2681, 2013 WL 5739078, at *2

---

[22]*See* Rec. Doc. No. 7, p. 6.

(E.D. La. Oct. 22, 2013); *Kent v. Schweiker,* 710 F.2d 110, 114 (3rd Cir. 1983).

**III.     Analysis**

Cheramie seeks review of the ALJ's denial of his DIB application for two reasons: (1) the ALJ committed error of law by failing to give proper weight to the opinion of his treating physician, Dr. Charles Schlosser ("Dr. Schlosser") and (2) that the ALJ's RFC assessment was not supported by substantial evidence.[23] The Court reaches only the first issue in this opinion.

Cheramie contends that the ALJ erred when he failed to give the proper controlling weight to the opinions of his treating physician, Dr. Schlosser.[24] Specifically, Cheramie contends that the ALJ erred when he gave more weight to the less restrictive findings of treating physician, Dr. Kenneth Adatto ("Dr. Adatto") who treated him from April 8, 2008, to July 1, 2010, over the opinion of his other treating physician, Dr. Schlosser, who initially evaluated him in February 2008, and who also treated him during the evaluation period, from February 1, 2010, through October 13, 2011.[25] Cheramie contends that the ALJ summarily decided that Dr. Schlosser's opinions were not entitled to probative weight, ignoring the length of time and frequency of his examinations with Cheramie, as Dr. Schlosser examined him on twenty-one (21) separate occasions between February 1, 2010 and October 13, 2011 before his October 24, 2011, RFC assessment.

Cheramie also argues that the ALJ erred in using the opinion of a more remote treating physician, Dr. Adatto, to discount the findings of a more recent treating physician, Dr. Schlosser,

---

[23]*See* Rec. Doc. No. 7, p. 9-10.

[24]*See* Rec. Doc. No. 7, p. 8-9.

[25]*See id.,* citing Tr. 25-26; Tr. 348-362 and 447-451.

when those remote findings were already used to deny his DIB application on February 24, 2010.[26] Cheramie argues that Dr. Adatto treated him on two occasions after the amended onset date, which occurred on March 30, 2010, and July 1, 2010. Cheramie contends that the rest of Dr. Adatto's opinions covered the time period already adjudicated by the ALJ in the February 24, 2010 denial of benefits.[27] Because this evidence was used in an earlier denial, Cheramie contends that it cannot be used to deny his benefits application again, as this violates Section 405(h) of the SSA, as the ALJ failed to consider each of the six factors listed in 20 C.F.R. § 404.1527(d). *See Drummond v. Commissioner of Social Sec. Admin.,* 126 F.3d 837, 841 (6th Cir. 1997) (Cheramie cites for the proposition that decisions made by the Administration cannot be repeatedly considered). Therefore, Cheramie contends that the ALJ erred by relying on findings of Dr. Adatto from April 8, 2008 through July 1, 2010, when he was asking for the ALJ to only adjudicate the time period of February 25, 2010 through December 22, 2011.

In opposition, the Commissioner contends that Cheramie's argument that the ALJ erred by failing to give proper weight to the opinion of treating physician, Dr. Schlosser, and failed to properly weigh each of the six factors set forth in 20 C.F.R. § 404.1527(d), before rejecting the opinion of his treating physician, is in error.[28] Here, the Commissioner contends that the ALJ gave no probative weight to Dr. Schlosser's opinion because it was unsupported by his own clinical notes, which indicated that Cheramie had stability in his condition and no deficits in neurological

---

[26]*Id.* at p. 10.

[27]*Id.* citing Tr. 317-320.

[28]*See* Rec. Doc. No. 8, p. 3.

7

functioning.[29]

The Commissioner also contends that the overall objective findings did not support the degree of limitation assessed by Dr. Schlosser, as the ALJ noted that the electromyography (EMG) test reflected only a mild degree of C-6 radiculopathy, and a cervical magnetic resonance imaging (MRI) showed primarily degenerative changes and a C5-6 disc bulge and foraminal narrowing. However, no there was no notation of nerve root compression or cauda equina compromise.[30] The Commissioner contends that a lumbar spine MRI also showed a disc bulge at L3-4 with slight spinal stenosis, but there were no findings of atrophy, muscle weakness, loss of strength, or loss of motor functioning.[31]

The opinion of the treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir.1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995). Unless good cause is shown to the contrary, "the opinion, diagnosis, and medical evidence of the treating physician, especially when the consultation has been over a considerable amount of time, should be accorded considerable weight." *Perez v. Schweike*, 653 F.2d 997, 1001 (5th Cir. 1981). "Good cause for abandoning the treating physician rule includes

---

[29]*Id.* citing Tr. 25. *See also* Tr. 22, 25, 371-72, 374, 378, 381, 383, 384, 386.

[30]*Id.* at p. 5; citing *Leggett*, 67 F.3d at 566; *see also Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) ("The absence in the record of objective factors indicating the existence of severe pain, such as persistent significant limitations in the range of motion, muscular atrophy, weight loss, or impairment of general nutrition justifies the conclusions of the administrative law judge"); 20 C.F.R. § 404.1527(c)(4). *See also* Tr. 23, 25, 251, 269-70.

Cauda equina is a bundle of spinal nerves and spinal nerve roots consisting of the second through fifth lumbar nerve pair, the first through fifth sacral nerves, the cocgeal nerve all of which originate in the conus medullares of the spinal cord.

[31]*Id.*

'disregarding statements [by the treating physician] that are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by evidence'." *Legett,* 67 F.3d at 566; citing *Greenspan,* 38 F.3d at 237.

Where there is reliable medical evidence from a treating or examining physician controverting the claimants treating specialist, the ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physicians views under 20 CFR 404.1527 (2); See *Newton v. Apel*, 209 F. 3d 448 ( 5th Cir. 2000).

The ALJ must give controlling weight to the opinion of a treating physician if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Martinez*, 64 F.3d at 176; (citing 20 C.F.R. § 404.1527(d)(2)).  However, " '[t]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 175 (quoting *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987)).

The relevant criteria to consider provides that the ALJ consider (1) the physician's length of treatment of the claimant; (2) the physician's frequency of examination; (3) the nature and extent of the treatment relationship; (4) the support of the physician's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the treating physician. *See* 20 C.F. R § 404.1527. Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176.

This case does not involve the issue of according weight to a non-treating physician. Rather, it involves the rejection of one treating physician's RFC limitation for another treating physician's

opinion, who provided earlier treatment to the patient. Cheramie contends that after the initial denial of his disability application he secured additional medical information which the ALJ rejected. As a result, Cheramie contends that the ALJ's failure to give weight to Dr. Schlosser, his treating physician's opinion, constitutes error such that his conclusion is not based upon substantial evidence.

The ALJ noted in his opinion that Dr. Schlosser's responses on the medical source form indicated that Cheramie was limited to a compromised range of activity that is below the full range of sedentary exertion. According to the ALJ, Dr. Schlosser attributed the limitation to cervical and lumbar radiculapothy.[32] When he considered Dr. Schlosser's assessment, the ALJ noted that the electrodiagnostic evidence only showed a mild degree of radiculapthy of the C6 level, and made no reference to the lumbar. The ALJ further noted that the range of limitation suggested by Dr. Schlosser was inconsistent with his own clinic notes which consistently showed stability of Cheramie's condition; which was also consistent with Dr. Adatto's notes.[33]

The ALJ noted that even though Dr. Schlosser's characterization of Cheramie's functional limitations were more extensive than the previous RFC determined by Dr. Adatto, the medical evidence did not show a worsening medical condition. As a result, the ALJ gave greater weight to Cheramie's previous treating physician, Dr. Adatto, who diagnosed him with cervical, thoracic and lumbosacral spondylosis without myleopathy.[34]

The ALJ reviewed Dr. Adatto's notes and noted that while Cheramie had a motorcycle

---

[32]*See id.,* at Rec. Doc. No. 6-2, Tr. 25.

[33]*Id. See also* Tr. 7.

[34]<u>Without Myelopathy</u> means that there was no functional disturbance and/or pathological change in the spinal cord; often used to denote nonspecific lesions.


accident in December 2009, he did not report it to Dr. Adatto until March 2010. The ALJ also pointed out that Dr. Adatto noted this delayed report in his medical notes.[35]

The ALJ also noted that Cheramie saw Dr. Schlosser during the evaluation period for pain management of the back and neck symptoms.[36] The ALJ further noted that although the July 2008 cervical EMG studies showed only mild C6 cervical radiculopathy, Dr.Schlosser's diagnostic impression was cervical and lumbar radiculopathy. The ALJ also noted that there was no indication that lumbar electrodiagnostic studies were obtained, but an earlier cervical EMG showed only mild abnormality.

The evidence in the record however does not support the ALJ's finding that there was no diagnostic study of the lumbar spine. To the contrary, not only was there a diagnostic of the lumbar spine in the record, but this study suggested that there was also radiculopathy due to the presence of the left-sided foramen. The MRI of the lumbar spine was done on May 27, 2008 and showed facet joint degenerative change, assuming that the transitional vertebra was L5, along with ligamentum flavumn hypertrophy which created slight spinal stenosis at the L3-L4, level.[37] It also showed a mild broad based bulge of the L3-4 disc post posterolaterally to the left with the left-sided L3-4 foramen, which is a spine condition characterized by enlargement of the vertebral foramen, which puts pressure on the spinal nerve.[38]

The ALJ further concluded that the clinical records repeatedly showed no substantial change

---

[35] *See* Rec. Doc. No. 6-7, Tr. 285.

[36] *See* Rec. Doc. No. 6-2, Tr. 22.

[37] *See* Rec. Doc. No. 6-7, Tr. 269.

[38] http://www.ehow.com/facts_5926215_left-foraminal-stenosis_.html 04/08/14.

in Cheramie's physical examination findings or his migraine complaints, and also concluded that his medical status was considered stable.[39] The ALJ also found it significant that Cheramie did not report the December 2009 motorcycle incident to Dr. Schlosser or the subsequent kyphoplasty during any of the pain management visits.[40]

According to the records, Cheramie began treating with Dr. Schlosser in February 2008, and reported neck, upper back and ankle pain, following an automobile accident.[41] Dr. Schlosser's notes from the February 2008 visit indicate that the straight leg raising test was negative.[42] The record evidences that Cheramie again visited Dr. Schlosser on October 15, 2009, November 12, 2009 and December 10, 2009. During these visits Cheramie reported that his pain was controlled and that his spasms had decreased due his taking Somas. Dr. Schlosser noted that his condition was stable with cervical and lumbar radiculopathy.[43]

During the visit of January 2010, not long after the December 2009 motorcycle incident, Cheramie returned to Dr. Schlosser for treatment of the flu. During this visit, Dr. Schlosser noted that Cheramie had no neurological issues.[44] On February 1, 2010, Cheramie returned for a follow up visit for lumbar and cervical radiculopathy with complaints of back pain radiating down the right lower extremity. Dr. Schlosser noted that he was stable on medications and that he had administered trigger point injections the prior week. He was prescribed Oxycodone, Soma, Lyrica and instructed

---

[39] *See* Rec. Doc. No. 6-2, Tr. 22.

[40] *See id,* at Tr. 22.

[41] *See id,* at Tr. 345.

[42] *See id,* at Tr. 346.

[43] *See id,* at Tr. 387-389.

[44] *See id,* at Tr. 386.

to return in one month.[45]

On March 2, 2010, Cheramie returned to Dr. Schlosser with complaints of right lower extremity symptoms and described his quality of life as "shitty." His physical examination remained unchanged, and he was instructed to return in one month.[46] On May 25, 2010, Cheramie returned. He complained of increased neck pain with lower back pain radiating to his leg. He was prescribed Oxycodone 30 mg and Somas for the muscle spasms. He was diagnosed with depression and instructed to return in one month.

On June 22, 2010, Cheramine returned for an additional visit with complaints of increased neck and back pain with lower back pain radiating down the leg. Dr. Schlosser injected him with a Toradol injection and noted that his spasms were normal. His physical examination remained unchanged and it was noted that Cheramie was developing a tolerance for the increased neck pain.[47]

On July 20, 2010, Cheramie returned to Dr. Schlosser with complaints of lower extremity pain, weakness and migraines every two to three days. On physical examination the lumbar parspinaous was tender with decrease flexion 30 degrees and no extension with lumbar facet loading. The straight leg raising tests was positive on this visit.[48] Also, on range of motion, his cervical area was painful. Dr. Schlosser noted that his cervical and lumbar radiculopathy was stable, that Cheramie's pain and spasms were stable, and he instructed Cheramie to return in one month.[49]

On August 19, 2010, during Cheramie's follow-up visit, Dr. Schlosser noted that Cheramie's

---

[45] *See id,* at Tr. 385.

[46] *See id,* at Tr. 384.

[47] *See id,* at Tr. 382.

[48] *See id,* at Tr. 381.

[49] *See id,* at Tr. 379.

low back pain and cervical radiculopathy were stable and found that his physical examination remained unchanged.[50] On October 14, 2010, Dr. Schlosser noted that Cheramie complained of a burning in his legs and back, but that he suffered from no neurological deficits, and his physical examination remained unchanged.[51] On December 9, 2010, Cheramie noted that he was able to fish, had a good quality of life and on physical examination, his strength was five out of five.[52]

On January 6, 2011, February 3, 2011 and on March 3, 2011, Cheramie's condition did not change. On March 31, 2011, he returned to Dr. Schlosser and reported no new weakness, radiations or pares thesis. His strength was rated as "a 5 out of 5" but there were increased tender points and his gait antalgic.[53] On April 28, 2011, Cheramie complained of waking up with stiffness, but his physical exam remained unchanged, and Dr. Schlosser noted that he had tolerance for the radiating pain in his neck and back. Finally, Cheramie returned for treatment with Dr. Schlosser, which was noted as stable although there were increased tender points. The notes however, suggest that Cheramie was in constant pain, and that on this occasion his quality of life was noted as wasteful.

As such, the ALJ did not comply with the regulations when he did not fully review Dr. Schlosser's medical records as one of Cheramie's treating physicians. The ALJ further rendered a decision that was not based upon substantial evidence because he overlooked the presence of the Lumbar MRI and then proceeded to discredit Cheramie's complaints of low back pain and Dr. Schlosser's diagnosis of lumbar radiculopathy. As a result, the Court finds that the ALJ's decision

---

[50] *See* Rec. Doc. No. 6-7, at Tr. 380.

[51] *See id,* at Tr. 378.

[52] *See id,* at Tr. 376.

[53] *See id,* at Tr. 372.

14

is not based on substantial evidence. *See Greenspan v. Shalala,* 38 F.3d 232, 237 (5th Cir. 1994) (treating physician should be given great weight); (*Miller v. Barnhart,* 211 Fed. App'x 303, 305 (5th Cir. Dec. 27, 2006) (citing *Frank v. Barnhart,* 326 F.3d 618, 620 (5th Cir. 2003).

## IV. Recommendation

**IT IS RECOMMENDED** that the decision of the Administrative Law Judge be **REVERSED AND REMANDED** for consideration of the entire record including the lumbar MRI and the treatment by Dr.Schlosser.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[54]

New Orleans, Louisiana, this 15th day of April, 2014.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[54]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.